# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **B. MARIE CROCKETT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00064 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, B. Marie Crockett, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Crockett protectively filed her application for SSI on April 10, 2006, alleging disability as of May 15, 2005, due to left wrist pain, lack of rotation in the left wrist, cramping and swelling in the fingers and hands, numbness and tingling and depression. (Record, ("R."), at 132-36, 161, 183, 208.) The claims were denied initially and on reconsideration. (R. at 80-82, 90, 92-93.) Crockett then requested a hearing before an administrative law judge, ("ALJ"). (R. at 94.) The hearing was held on July 30, 2007, at which Crockett was represented by counsel. (R. at 37-76.) A supplemental hearing was held on December 10, 2007, at which Crockett again was represented by counsel. (R. at 23-36.)

By decision dated January 14, 2008, the ALJ denied Crockett's claim. (R. at 10-22.) The ALJ found that Crockett had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 13.) The ALJ determined that the medical evidence established that Crockett suffered from severe impairments, including residual effects of a fracture of the left radius, major depression and chronic pain disorder, but he found that Crockett did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13-14.) The ALJ found that Crockett had

the residual functional capacity to perform less than the full range of light work,[1] but the full range of sedentary work.[2]  (R. at 14.)  Specifically, the ALJ found that Crockett could lift and carry items weighing up to 10 pounds frequently and up to 20 pounds occasionally with the right, dominant upper extremity, but only up to five pounds frequently and up to 10 pounds occasionally with the left, nondominant upper extremity.  (R. at 14.)  He found that Crockett could push/pull up to five pounds with the left upper extremity and that she could occasionally balance, bend, stoop, kneel, crouch, squat and climb stairs, ramps, ladders, ropes and scaffolds, but that she could not crawl. (R. at 14.) The ALJ found that Crockett could occasionally use her left hand for feeling, fingering and gripping and that she should avoid concentrated exposure to hazards. (R. at 14.) The ALJ found that Crockett was moderately limited in her ability to concentrate, maintain attention for extended periods and keep up a pace due to pain and medication effects.  (R. at 14.)  He further found that she was moderately limited in her ability to understand and remember complex instructions and to make judgments on complex work-related decisions.  (R. at 14.)  The ALJ also found that Crockett was markedly limited in her ability to carry out complex instructions.[3]  (R. at 14.)  Thus, the ALJ

_____

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If an individual can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. § 416.1567(b) (2010).

[2] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. § 416.967(a) (2010).

[3] I note that the ALJ apparently mistakenly noted a finding in one of the headings in his decision that Crockett was only moderately limited in her ability to carry out complex instructions.  However, he specifically found twice in the body of his decision that she was markedly limited in this ability, and he stated that he was according significant weight to the

found that Crockett was unable to perform her past relevant work. (R. at 19.) Based on Crockett's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Crockett could perform other jobs existing in significant numbers in the national economy, including jobs as dry cleaning bagger and a nonpostal mail clerk, both at the light level of exertion, and a food/beverage order clerk and an addresser, both at the sedentary level of exertion. (R. at 21.) Therefore, the ALJ found that Crockett was not under a disability as defined under the Act and was not eligible for benefits. (R. at 21-22.) *See* 20 C.F.R. § 416.920(g) (2010).

After the ALJ issued his decision, Crockett pursued her administrative appeals, (R. at 130-31), but the Appeals Council denied her request for review. (R. at 1-6.) Crockett then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2010). The case is before this court on Crockett's motion for summary judgment filed February 7, 2011, and the Commissioner's motion for summary judgment filed March 3, 2011.

## II. Facts and Analysis

Crockett was born in 1956, (R. at 132), which, at the time of the alleged onset, classified her as a "younger person" under 20 C.F.R. § 416.963(c). She graduated from high school and has past work experience as a nanny, a stocker in a retail clothing store, a painter's assistant and a cashier. (R. at 139-45, 165.) The

opinion of psychologist Cronin, who also found Crockett to be markedly limited in this area. I further note that, in presenting hypothetical questions to the vocational expert, the ALJ correctly included this limitation as marked.

vocational expert classified Crockett's job as a painter's assistant as medium[4] and skilled, while the remaining jobs were classified as medium and semiskilled. (R. at 28.)

In rendering his decision, the ALJ reviewed records from Prince George's Hospital; Dr. Ricardo Pyfrom, M.D.; Inova Alexandria Hospital; Dr. Ashraf Uzzaman, M.D.; Dr. William Amos, M.D., a state agency physician; Florida Hospital Fish Memorial; Carolinas Medical Center; Earl Hedrick, D.C.; Mary Eileen Cronin, Ph.D., a licensed clinical psychologist; and Woodburn Community Mental Health Center. Crockett's attorney submitted additional medical records from Woodburn Community Mental Health Center; Bailey's Health Center; Dr. Dacus, M.D.;[5] and Natalia Lueck, M.A., a resident in counseling, to the Appeals Council.[6]

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2010).

[5] Dr. Dacus's first name is not included in the record.

[6] Since the Appeals Council considered these records in deciding not to grant review, (R. at 1-6), this court also must consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Crockett argues that the ALJ erred by failing to find that her impairment met or equaled the medical listing for fracture of an upper extremity, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.07. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Crockett also argues that the ALJ erred in his evaluation of her mental impairments. (Plaintiff's Brief at 9-12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

On January 10, 2006, Crockett presented to the Emergency Department at Prince George's Hospital with complaints of continued left wrist pain following a fracture in November 2004. (R. at 227-34.) There was mild tenderness and deformity of the left wrist, and Crockett was prescribed Motrin. (R. at 229, 234.) On January 24, 2006, Crockett saw Dr. Ricardo O. Pyfrom, M.D., with complaints of left wrist pain, numbness in her index and middle fingers and inability to use her hand. (R. at 236-38.) Examination showed a prominent ulna with decreased range of motion to 30 degrees in each direction. (R. at 236.) Dr. Pyfrom diagnosed a

malunion[7] of the distal radius. (R. at 235-36.) Crockett presented to the Emergency Department at Inova Alexandria Hospital on February 7, 2006, with complaints of lack of feeling, swelling and decreased range of motion of the left wrist. (R. at 240-49.) Physical examination showed tenderness and swelling of the left wrist, but x-rays were normal. (R. at 244-45.) She was diagnosed with a sprained wrist, she was advised to rest it, apply ice and elevate it as much as possible, and she was prescribed anti-inflammatory medication. (R. at 246-47.)

When Crockett saw Dr. Ashraf Uzzaman, M.D., on June 3, 2006, she reported that she had not undergone physical therapy after fracturing her wrist due to financial reasons. (R. at 250-53.) She reported lack of mobility of the left wrist, as well as intermittent pain and swelling, especially after use. (R. at 250.) Crockett stated that she could not perform manipulative activities with her left wrist and could not lift any weight with her left hand, but could lift items weighing up to 20 pounds with her right hand. (R. at 250.) She reported no functional limitations regarding sitting, standing or walking. (R. at 250.) Crockett reported that she was on Motrin and Percocet as needed. (R. at 250.) She reported activities of daily living to include some light cleaning and cooking. (R. at 251.) Physical examination showed no clubbing, cyanosis or edema of the extremities. (R. at 252.) Crockett was alert, had good eye contact and fluent speech, appropriate mood and clear thought processes. (R. at 252.) Her memory was normal, and concentration was good. (R. at 252.) Wrist flexion and wrist extension were 4/5 in the left and 5/5 in the right, finger abduction was 5/5 bilaterally, and hand grip was 5/5 bilaterally. (R. at 252.) Sensory examination was normal to pinprick and light

---

[7] Malunion is a clinical term used to indicate that a fracture has healed, but that it has healed in less than an optimal position. *See* CLEVELAND CLINIC, http://my.clevelandclinic.org/disorders/fractures/or_mal-union.aspx (last visited May 25, 2011).

touch throughout, and straight leg raise testing was negative bilaterally. (R. at 252.) Reflexes were 2+ and symmetric in the biceps, brachioradialis, patellar and Achilles distribution. (R. at 252.) There was tenderness over the left wrist on the dorsal surface with a bony deformity, and there was an ulnar prominence on left wrist. (R. at 252-53.) Dr. Uzzaman noted no instability or inflammation. (R. at 253.) Range of motion was normal in all areas except for extension of the left wrist to 50 degrees and flexion to 70 decrees, both causing pain. (R. at 253.) The radial deviation and the ulnar deviation were normal. (R. at 253.)

Crockett was able to lift, carry and handle light objects, she was able to squat and rise from that position with ease, she was able to rise from a sitting position without assistance, and she had no difficulty getting up and down from the exam table. (R. at 253.) Crockett could walk on the heels and toes, tandem walking was normal, and she could hop on one foot bilaterally. (R. at 253.) She could dress and undress adequately and was cooperative during the examination. (R. at 253.)

Dr. Uzzaman opined that Crockett could sit, stand and walk normally in an eight-hour workday with normal breaks. (R. at 253.) He further opined that she could carry items weighing up to 50 pounds occasionally and up to 30 pounds frequently with the right hand and up to 10 pounds occasionally with the left hand. (R. at 253.) Dr. Uzzaman opined that Crockett could not lift any amount of weight frequently with the left hand. (R. at 253.) He opined that she could perform postural activities frequently. (R. at 253.) He further opined that she could perform manipulative limitations, such as reaching, handling, feeling, grasping and fingering with the right arm and hand frequently, but he noted that Crockett could occasionally handle, feel, grasp and finger with the left arm and that she had no

limitation on the ability to reach with the left arm.  (R. at 253.)  He imposed no visual, communicative or workplace environmental limitations.  (R. at 253.)

Another x-ray of the left wrist, taken on June 7, 2006, showed a post-traumatic deformity of the distal radius and old ulnar styloid avulsion fracture.  (R. at 303.)  There was a positive ulnar variance.[8]  (R. at 303.)

Dr. William Amos, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on June 20, 2006, finding that Crockett could perform light work.  (R. at 256-62.)  He found that she could occasionally climb, balance, stoop, kneel, crouch and crawl, and he imposed no manipulative, visual, communicative or environmental limitations.  (R. at 258-59.)  Dr. Amos found Crockett's statements fully credible.  (R. at 261.)  Dr. Syed Hassan, M.D., completed a Request For Medical Advice on November 14, 2006, recommending the affirmation of Dr. Amos's findings.  (R. at 267-68.)

When Crockett presented to the emergency department at Florida Hospital Fish Memorial on September 23, 2006, she was diagnosed with depression and a sprained wrist, and she was prescribed Naprosyn, Elavil and Zoloft.  (R. at 264-65.)  When she received treatment at Carolinas Medical Center University Emergency Department on January 29, 2007, Dr. Joseph Dore, D.O., diagnosed headache, and he prescribed Tramadol and an arm sling.  (R. at 269-74.)

---

[8] A positive ulnar variance indicates that the ulna is longer than the radius.  *See* http://www.mondofacto.com/facts/dictionary?ulnar+variance (last visited May 26, 2011).

Earl R. Hedrick, D.C., a chiropractor, wrote a letter dated July 26, 2007, stating that as a courtesy to one of his patients, who happened to be Crockett's cousin, he had reviewed two sets of Crockett's x-rays presented to him. (R. at 276.) He noted that the first set, dated November 16, 2004, showed a fracture of Crockett's radius, while the second set, dated December 15, 2004, showed the same fracture with no signs of bone remodeling having taken place. (R. at 276.) Hedrick further noted Dr. Pyfrom's diagnosis of a malunion of the distal radius. (R. at 276.) He opined that the fracture may not have healed, and he advised that Crockett needed to see a good orthopedist to determine the status of the fracture and what could be done to correct any problem. (R. at 276.) However, Hedrick noted that while "[t]his is not my field of endeavor … there appears to be a serious problem with Ms. Crockett['s] left distal Radius." (R. at 276.)

Crockett was seen at Woodburn Community Mental Health Center, ("Woodburn"), from August 10, 2007, through July 24, 2008. (R. at 306-457.) On August 29, 2007, Crockett reported taking only Advil and Tylenol as needed. (R. at 421.) She was alert and fully oriented, had good insight, judgment and impulse control, goal-directed thoughts without abnormal content, and she denied suicidal or homicidal ideations. (R. at 421.) Crockett was tearful and sad with an anxious demeanor and speech. (R. at 421.) Dr. Kara Ditto, M.D., diagnosed major depressive disorder, ("MDD"), mild to moderate, without psychotic features; and pain disorder associated with psychological factors and general medical condition. (R. at 421.) Her Global Assessment of Functioning, ("GAF"), score was rated as 45,[9] and Dr. Ditto prescribed Seroquel. (R. at 421.) On September 5, 2007,

_____

[9] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC

Crockett saw Dr. Rosemarie Isidro, M.D., at which time she was tearful, but reported improved sleep and concentration, but continued anxiety. (R. at 416.) Dr. Isidro made the same diagnosis and GAF assessment as Dr. Ditto. (R. at 417.) On September 10, 2007, she saw Sharon Watson, a licensed professional counselor, who assessed her GAF score as 50, with the highest in the previous year being 65.[10] (R. at 450.) Crockett reported that Seroquel was helping her rest, but she noted difficulty with focus and thoughts of cutting her arm off due to pain. (R. at 442.) On mental status examination, Watson noted agitated behavior, poor concentration, anhedonia, a sad, depressed, anxious and withdrawn mood, a labile affect, phobia of falling again and further damaging her arm and impaired recent and immediate memory. (R. at 447-48.) Watson further noted orientation, speech and thought process within normal limits, and she opined that Crockett was of average intelligence. (R. at 447-48.) She diagnosed MDD, recurrent, severe. (R. at 449.) The same day, Crockett also saw Dr. Teresita Lega, M.D., noting that she experienced worsening depression "on and off," reporting good days and bad days. (R. at 413.) She stated that she planned to travel to Florida the following week. (R. at 413.) Her affect was depressed, but she had no thought disorder, and she was future- and goal-oriented. (R. at 413.) Her diagnosis remained the same, as did her GAF score. (R. at 413.)

---

AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

[10] A GAF score of 61 to 70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

Crockett saw Mary Eileen Cronin, Ph.D., a licensed clinical psychologist, on September 11, 2007, for a mental status examination at the request of Disability Determination Services. (R. at 277-80.) Crockett appeared to be in good physical shape, other than her chronic pain, and she was friendly and cooperative. (R. at 278, 280.) She was tearful through much of the interview, and she reported constant worry. (R. at 278.) Eye contact was poor, and she spoke rapidly at times about her pain. (R. at 278.) Despite taking Seroquel, Crockett reported not being able to sleep when her pain was severe, causing her to feel exhausted. (R. at 278.) She stated that she felt like she was "falling apart." (R. at 279.) No obsessive/compulsive, psychotic or manic traits were noted, but she admitted passive suicidal thoughts without plan or intent. (R. at 279.) She reported being very anxious and depressed, not liking to be in loud places or crowds, and she stated that she liked to socialize with people on an individual basis only. (R. at 279.) Crockett stated that her concentration was very poor, especially in relation to her pain, but she reported being able to handle her own finances. (R. at 279.) Cronin diagnosed major depression, severe, secondary to chronic pain, and she assessed Crockett's GAF score at 52.[11] (R. at 280.)

Cronin noted that while Crockett had been a good worker in the past, she had always performed work requiring a lot of physical stamina, which she no longer had the ability to do. (R. at 280.) She opined that Crockett could handle supervision and would be friendly in a job that put her in contact with the public, but she concluded that Crockett might decompensate in a setting requiring her to work at a quick pace. (R. at 280.)

---

[11] A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning. . . ." DSM-IV at 32.

Cronin also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), ("MSS"), finding that Crockett was mildly impaired in her ability to make judgments on simple work-related decisions, to interact appropriately with the public and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 281-83.) Cronin opined that Crockett was moderately impaired in her ability to understand and remember complex instructions and to make judgments on complex work-related decisions. (R. at 281.) She found that Crockett's ability to carry out complex instructions was markedly impaired. (R. at 281.) In all other areas, she was deemed not limited. (R. at 281-82.) Cronin based her findings on Crockett's below average intellectual skills, which were compromised by depression and obsession with chronic pain. (R. at 282.)

On October 24, 2007, Dr. Ditto gave Crockett samples of Lexapro. (R. at 409-11.) Crockett did not appear tearful, but she did appear depressed. (R. at 409.) She was goal-directed and without suicidal or homicidal ideation. (R. at 409.) Her diagnoses and GAF assessment of 45 remained unchanged. (R. at 410.) When Crockett saw Lauren Coyle, Psy.D., for counseling on November 6, 2007, she reported feeling better when around family. (R. at 394.) She denied any panic attacks that week, and she denied suicidal or homicidal ideations. (R. at 394.) The same day, when Crockett also saw Dr. Arda Kasaci, M.D., she was alert, calm and interactive. (R. at 407.) She had been compliant with medications without side effects. (R. at 407.) Her condition was described as stable, and her diagnosis remained the same, with a GAF score of 45 to 50. (R. at 407-08.) When Crockett saw Dr. Philip Smith, M.D., on November 9, 2007, she did not appear impaired, her thought process was linear, and she appeared euthymic. (R. at 387.) Insight

and judgment were fair, and sensorium and cognition were grossly intact. (R. at 387.) Crockett's mood was described as "so-so." (R. at 387.) She planned to drive to Florida to pick up her mother. (R. at 387.) When Crockett saw Coyle for counseling on November 13, 2007, she stated that her mood had been "ok" over the previous week and that she noticed improvement in her mood when with family and friends. (R. at 385.) She stated that she remained busy during the day, and she denied suicidal or homicidal ideations. (R. at 385.) Crockett reported that she was flying to Florida the next day to visit her sister and mother before driving her mother back to Virginia for Thanksgiving. (R. at 385.) She stated that she felt safe and capable of driving the long distance. (R. at 385.) The same day, Dr. Kasaci described Crockett's condition as stable, and her diagnosis and GAF assessment remained unchanged. (R. at 405-06.)

On November 20, 2007, Crockett was cooperative and oriented, but her mood was sad, depressed and anxious. (R. at 423.) Her thought process was logical and goal-directed, she denied suicidal or homicidal ideations, and her remote memory appeared slightly impaired. (R. at 423.) She denied symptoms of mania, but endorsed periods of suicidal ideation, which she described as mornings she did not want to wake up. (R. at 423.) However, she stated that she would never harm herself. (R. at 423.) Her insight was poor, judgment was fair, and she was deemed to be of average intelligence. (R. at 432.) On December 7, 2007, Crockett reported that medications continued to help. (R. at 402.) Dr. Ditto made the same diagnosis and GAF assessment. (R. at 402-03.) On December 11, 2007, Crockett again reported that medications continued to help. (R. at 399.) She reported her mood as anxious and sad at times, but she related it to worry about her disability hearing. (R. at 399.) She denied suicidal or homicidal ideation and

manic or psychotic symptoms.  (R. at 399.)  Dr. Boshra Almoyed, M.D., diagnosed MDD in partial remission, assessed her GAF score at 50 and prescribed Gabapentin.  (R. at 399-400.)  On April 10, 2008, Crockett again reported that she felt medications had been helpful, and on May 7, 2008, she reported doing better.  (R. at 375, 378.)  On May 12, 2008, she reported that she was having wrist surgery later that week.  (R. at 374.)  On June 17, 2008, she again reported doing well.  (R. at 373.)  On July 10, 2008, Crockett reported feeling anxious and upset since recovering from wrist surgery. (R. at 372.) She was labile and tearful and admitted taking her medications sporadically since surgery, despite admitting feeling "much better" when she took them.  (R. at 372.)  On July 24, 2008, Crockett stated that she felt a bit better since resuming her medications on a regular basis, noting an improvement in overall mood and less depression.  (R. at 371.) She denied suicidal or homicidal ideations.  (R. at 371.)  Crockett stated that she might visit family in Florida later that month.  (R. at 371.)

Crockett was seen at Bailey's Health Center from November 27, 2007, through July 29, 2008.  (R. at 460-99.)  On November 27, 2007, Dr. Balcha[12] completed a Medical Report For General Relief And Medicaid, ("General Relief Form"), in which he diagnosed Crockett with chronic left forearm/wrist pain status post malunion fracture and depression. (R. at 497-98.)  Dr. Balcha stated that her condition was expected to improve or remain unchanged, and he further stated that these diagnoses rendered Crockett unable to work or severely limited her capacity for self-support for six months from the onset.  (R. at 497-98.)  He opined that she was restricted from heavy lifting with the left arm.  (R. at 497.)  On January 11, 2008, Crockett was alert and oriented and in no acute distress.  (R. at 495.)  Dr.

---

[12] Dr. Balcha's first name is not included in the record.

Balcha prescribed Celebrex in addition to her existing prescription for Neurontin. (R. at 495.) X-rays of the left wrist showed no acute fracture. (R. at 468.) On January 29, 2008, Crockett was again alert and oriented and in no acute distress. (R. at 492.) Dr. Balcha continued Crockett on Lexapro and Seroquel. (R. at 492.) On March 1, 2008, Crockett remained alert and oriented and in no acute distress. (R. at 490.) On March 21, 2008, Dr. Balcha completed another General Relief Form, noting that Crockett's condition was expected to improve, and he noted that her limitations were expected to last four months from the onset date. (R. at 488.) Dr. Balcha restricted Crockett from heavy lifting with the left hand. (R. at 488.) He further noted that Crockett was following up with University of Virginia orthopedic services. (R. at 488.) A bone scan performed on May 1, 2008, showed osteoporosis, placing Crockett at an increased risk for fracture. (R. at 462-66.) On May 19, 2008, Crockett called to inform Dr. Balcha that she was undergoing hand/wrist surgery on May 26, 2008.[13] (R. at 483.) On June 10, 2008, Crockett requested x-rays of her left wrist after falling that day. (R. at 482.) These x-rays showed a nondisplaced distal radius. (R. at 460.)

On September 15, 2008, Dr. Dacus, a physician with the Orthopedic Department at The University of Virginia Medical Center, completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical), finding that Crockett could lift/carry items weighing up to 20 pounds both frequently and occasionally. (R. at 501-02.) Dr. Dacus further found that Crockett could stand/walk for a total of six hours in an eight-hour workday and that she could do so for two hours without interruption. (R. at 501.) Dr. Dacus opined that Crockett's

---

[13] There are no records pertaining to this wrist surgery contained in the record.

ability to sit was not affected by her impairments. (R. at 501.) He found that Crockett could occasionally climb, stoop, kneel, balance, crouch and crawl, and he found that her abilities to handle, and to push/pull were affected by her impairment. (R. at 502.) Dr. Dacus imposed no environmental restrictions. (R. at 502.)

Crockett saw Natalia Lueck, M.A., a resident in counseling, from April 26, 2009, through October 26, 2009. (R. at 505-22.) On May 6, 2009, Crockett was less depressed, but more "numb." (R. at 509.) She had a wider range of affect, and she denied suicidal or homicidal ideation. (R. at 509.) She reported taking Paxil as directed, which had resulted in less crying and more calmness. (R. at 509.) On July 15, 2009, Crockett's affect was depressed and anxious, but she reported having attended two funerals of relatives that week lost to colon cancer. (R. at 508.) She reported anxiety over her own upcoming colonoscopy. (R. at 508.) She reported vague suicidal ideation with no plan or means. (R. at 508.) Crockett noted some medication side effects, and she admitted not having her medications for three weeks during her last visit to Florida, which made her feel "really sick" as a consequence. (R. at 508.) She stated that she planned to never be without her medications again. (R. at 508.)

On August 6, 2009, Crockett was less anxious and less depressed, reporting good results from the colonoscopy. (R. at 507.) She reported continued medication compliance and family support. (R. at 507.) Crockett stated that she was leaving for Florida that afternoon. (R. at 507.) She was alert and fully oriented, attentive, cooperative and exhibited appropriate behavior. (R. at 512.) Her speech was spontaneous, and she commented about doing better. (R. at 512.) Her mood was

"OK," and her affect was appropriate. (R. at 512.) Thought process was goal-oriented, and thought content was without spontaneous delusions. (R. at 512.) Crockett denied suicidal or homicidal ideations. (R. at 512.) Her sleep and appetite were good. (R. at 512.) Dr. Ricardo Rius, M.D., diagnosed MDD, in partial remission; panic disorder without agoraphobia; and generalized anxiety disorder. (R. at 512.) On September 28, 2009, Crockett reported increased anxiety and cried due to recent difficulties with family members whom she believed were "getting tired of [her]." (R. at 505.)

On October 8, 2009, Crockett saw Dr. Balcha with complaints of blacking out the previous week, which she attributed to stress. (R. at 531.) She further reported increased depression and continued left wrist pain. (R. at 531.) Crockett was alert and oriented. (R. at 531.)

Crockett first argues that the ALJ erred by failing to find that her impairment met or equaled the medical listing for fracture of an upper extremity, found at § 1.07. For the following reasons, I find this argument unpersuasive. In order to meet § 1.07, a claimant must show a fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius or ulna under continuing surgical management, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.07 (2010). While the record clearly shows that Crockett suffered a fracture of the shaft of the radius, the other criteria of the listing are not met. First, there is no medical evidence that Crockett suffered a nonunion of the fracture as required by the listing. Instead, in January 2006, Dr. Pyfrom opined that Crockett had suffered a malunion of the fracture. A

nonunion and a malunion are two distinct things, the first being a failure to heal and the latter being an abnormal healing. Section 1.07 does not encompass such malunions. It is well-settled in this circuit that a claimant must meet all of the criteria of a listing in order to meet that particular listing. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). The Court in *Sullivan* clarified that meeting only some criteria of a listing, "no matter how severely, does not qualify." 493 U.S. at 530. Additionally, as the Commissioner states in his brief, Crockett has not undergone continuing surgical management of her fracture. There are no medical records pertaining to Crockett's treatment for this fracture contained in the record. While there is some evidence in the record that Crockett underwent left wrist surgery in May 2008, there is no information regarding the reason for this surgery. In any event, the fracture occurred in November 2004, and a surgery nearly four years later, with no intervening surgical treatment, cannot satisfy the criteria of the listing. Therefore, I find that substantial evidence supports the ALJ's finding that Crockett's fracture does not meet § 1.07.

Additionally, I find that substantial evidence supports the ALJ's finding that Crockett's fracture does not equal the criteria set forth in § 1.07. "When a person's disabilities do not fit the criteria for a 'listed disability' the [Commissioner] must evaluate the claimant's disabilities and determine whether they are of such severity that he cannot engage in substantial gainful work which exists in the national economy." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing 42 U.S.C.A. § 423(d)(2)(A) and *Lewis v. Weinberger*, 541 F.2d 417, 420 (4th Cir. 1976)). The regulations also provide that if a person's impairments do not exactly fit within the criteria for a listed impairment, the Commissioner will determine whether the person's impairments are the medical equivalent of a listed

impairment. Pursuant to 20 C.F.R. § 416.926 (2010), a claimant's impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment. Medical equivalence may be found if a claimant has an impairment that is described in the listed impairments, but the claimant does not exhibit one or more of the findings specified in the particular listing. If such a claimant has other findings related to her impairment that are at least of equal medical significance to the required criteria, then the claimant's impairment is medically equivalent to that listing.

Crockett argues that the Fourth Circuit's opinion in *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986) mandates a finding that the ALJ erred by failing to find that her impairment equals the criteria of § 1.07. I disagree. In *Cook*, although there was ample evidence to support a finding that the claimant's arthritis met or equaled one of the listed impairments, the ALJ found that it did not. *See* 783 F.2d at 1172. The Fourth Circuit found that the ALJ erred by failing to include in the decision a statement of the reasons for the decision that Cook's arthritis did not meet or equal a listed impairment. *See Cook*, 783 F.2d at 1172. The Fourth Circuit held that the ALJ should have identified the relevant listed impairments and then compared each of the listed criteria to the evidence of Cook's symptoms. *See Cook*, 783 F.2d at 1173. Without such an explanation, the court held, it was impossible to tell whether there was substantial evidence to support the determination. *See Cook*, 783 F.2d at 1173.

I find that the case at bar is distinguishable from *Cook*. Here, notwithstanding the ALJ's failure to explicitly state the reasons that Crockett's impairment did not equal a listed impairment, substantial evidence supports such a

finding because the ALJ thoroughly discussed the evidence relating to Crockett's previous fracture and, read as a whole, the ALJ's decision establishes that the appropriate factors were considered in finding that Crockett's impairment did not equal § 1.07. In particular, the ALJ discussed the February 2006 x-rays that showed no fracture, dislocation or bone destruction, he discussed Dr. Uzzaman's findings, which included good muscle strength in the left wrist, ability to handle light objects with the left hand, carry items weighing up to 50 pounds occasionally and up to 30 pounds frequently with the right hand, that there were no manipulative limitations on reaching, handling, fingering, grasping and feeling with the right arm and hand and that Crockett could do so frequently, that she could perform such manipulative actions occasionally with the left hand and arm, except that she had no limitations on reaching with the left arm, that she had no instability or inflammation of the left wrist, that she had full grip strength on the right and 4/5 grip strength on the left, and that she had no limitations on performing fine and gross manipulation with either hand. The ALJ further noted that, despite some pain, Crockett's medical tests were relatively normal, they showed minimal pain, and her treatment was mostly conservative in nature. (R. at 17-18.) The ALJ further noted that Crockett had not undergone any type of surgery to repair her left wrist injury and that medications and treatment had significantly improved her medical condition to the residual functional capacity as found. (R. at 18.)

For all of these reasons, it is clear that, unlike *Cook*, it is not impossible for this court to determine whether the ALJ's determination is supported by substantial evidence without an explanation of the listing considered relevant by the ALJ. Although the ALJ did not explicitly state in his decision that Crockett's

impairment did not equal § 1.07, there is substantial evidence to support a finding that Crockett is not disabled pursuant thereto. In addition to the reasoning advanced by the ALJ, I further note that Dr. Williams's June 2006 residual functional capacity assessment, Crockett's testimony at her hearing that she could push and/or pull with her arms and hands, she could reach overhead without problems and that she had no problem using her fingers, hands and/or arms, as well as Crockett's activities of daily living, including performing light housework with assistance, walking one mile, the ability to drive and her ability to take numerous road trips from Virginia to Florida and back, further support the ALJ's finding that Crockett's impairment did not equal the requirements of § 1.07.

Crockett also argues that the ALJ erred in his evaluation of the severity of her mental impairments and their effect on her ability to work. (Plaintiff's Brief at 9-12.) Again, I disagree. The ALJ found that Crockett suffers from severe major depression, but that her only work-related mental limitations were a moderate limitation in the ability to concentrate, maintain attention for extended periods, keep up a pace, understand and remember complex instructions and to make judgments on complex work-related decisions and a marked limitation on her ability to carry out complex instructions. (R. at 14.) It is true, as Crockett argues, that her GAF scores have ranged from 45 to 52, indicating moderate to serious symptoms. However, as the Commissioner argues, GAF scores are not determinative of disability. A claimant's GAF score must be considered along with all the other relevant evidence of record. The Social Security Administration has taken the stance that the GAF scale "does not have a direct correlation to the severity requirements in [the social security] mental disorders listings." Revised

Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000).

The record as a whole shows that Crockett was diagnosed with MDD without psychotic features; panic disorder without agoraphobia; and generalized anxiety disorder. (R. at 403, 406, 408, 410, 414, 417, 421, 512.) However, the record further shows that her conditions improved over time with medication and counseling, with her MDD improving from mild to moderate in August 2007 to being described as in partial remission in December 2007 and again in August 2009. (R. at 399-400, 421, 512.) The DSM-IV states that the specifier "in partial remission" indicates that the criteria of the disorder are no longer met. *See* DSM-IV at 829. Crockett's condition was described as stable on November 6 and November 13, 2007, and she reported doing "better" and "well" in May 2008 and June 2008, respectively. (R. at 373, 375, 405, 407.) Similarly, Crockett's GAF score was assessed as 45 in August 2007, but had increased to 52 by September 2007 and 50 in December 2007. (R. at 280, 399-400, 421.) Additionally, as indicated above, Crockett reported on numerous occasions that Seroquel, Lexapro and Paxil have helped her condition, resulting in less depression, less anxiety, less crying spells and improved concentration. (R. at 371-72, 402, 507-09, 512.) In particular, Crockett believed that her medications helped her so much that she informed Lueck in May 2009 that she would never be without them again after not taking them for three weeks and feeling very sick. (R. at 508.) It is well-settled that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Crockett also reported on more than one occasion that she felt better when around family and friends. (R. at 385, 394.) Moreover, despite allegations of disabling mental

impairments, she was able to make numerous road trips from Virginia to Florida and back without difficulty. Lastly, I note that psychologist Cronin's opinions, as enumerated herein, lend further support to the ALJ's mental residual functional capacity finding.

Based on the above-cited evidence, I find that substantial evidence supports the ALJ's mental residual functional capacity finding and the resulting finding that Crockett is not disabled and not entitled to SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Crockett's impairment does not meet or equal the listing for fracture of an upper extremity, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.07;

2. Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding; and

3. Substantial evidence exists in the record to support the ALJ's finding that Crockett was not disabled under the Act and was not entitled to SSI benefits.

# RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Crockett's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     June 1, 2011.

/s/  *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE